IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SANDRA MICHELE BECK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:18-CV-218-Z-BR |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Texas Department of Criminal Justice's ("TDCJ") Motion for

Summary Judgment (ECF 45, 49).[1] The undersigned recommends the motion be GRANTED.

**I.     FACTUAL BACKGROUND**

**A.  Beck's first term of employment with TDCJ, claims related to 2012 termination, and
2012 rehiring**

Plaintiff Sandra Beck ("Beck") first began working for TDCJ in 2000 and was eventually

promoted to correctional officer. (ECF 46 at 5–6). On May 16, 2012, Senior Warden Charles

McDuffie signed a dismissal recommendation form recommending Beck be dismissed, and Beck

received notice of the recommendation. (ECF 57-1 at 1–2). On June 9, 2012, Beck filed a Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex

discrimination and retaliation for complaining of sexual harassment. (*Id*. at 2–11). On June 11, 2012,

TDCJ Regional Director Jason Heaton ("Director Heaton") joined in the recommendation to

terminate Beck's employment by signing the dismissal recommendation form. (*Id*. at 1, 19). Beck's

---

[1] Former Defendant Bryan Collier joined in the motion, but has since been dismissed from the action. (ECF 68).

employment was ultimately terminated. (*See* ECF 57-2 at 9–10). Beck internally appealed her termination and began working for TDCJ again in October 2012. (ECF 46 at 11–12; 57-2 at 10, 12). On July 23, 2015, Beck filed a lawsuit against TDCJ related to her 2012 termination alleging sex discrimination, sexual harassment, and retaliation. *See Beck v. Tex. Dep't of Criminal Justice*, No. 2:15-CV-233-J, ECF 1. The parties settled through mediation in 2016. *See Beck v. Tex. Dep't of Criminal Justice*, No. 2:15-CV-233-J, ECF 26. Director Heaton attended the mediation and testified at his deposition that he was sure he shared the mediation results with his superiors. (ECF 57-1 at 30, 34–35).

**B. Beck's second term of employment with TDCJ**

During Beck's second term of employment with TDCJ, Lieutenant Ramon Garcia ("Lieutenant Garcia") completed various internal documents as Beck's "supervisor." (*Id*. at 52–54, 57–58). The earliest of these documents is dated July 4, 2016. (*Id*. at 52). Lieutenant Garcia also stated during internal proceedings he was Beck's supervisor. (ECF 57-3 at 33).

In August 2016, Lieutenant Garcia, a sergeant[2] at the time, and Beck went to an offsite location for a mandated random drug test. (ECF 46 at 17–18, 283; 47-3 at 104). Lieutenant Garcia asked Beck personal questions about her and her husband and referred to the trip as a "date." (ECF 46 at 17–18). On October 6, 2016, Beck notified Lieutenant Garcia she would be late to work. (ECF 54 at 274). Lieutenant Garcia wrote Beck an employee performance log ("EPL") for being late, but later removed the EPL and told Beck she was his favorite and he liked her. (*Id*. at 274–75). On October 29, 2016, Lieutenant Garcia wrote Beck an EPL for being late to work. (*Id*. at 275). Beck filed a grievance regarding the October 29, 2016 EPL, and the EPL was removed. (ECF 46 at 318–20). On December

---

[2] A sergeant is the first-line supervisor on a shift. (*See* ECF 46 at 12). Above the rank of sergeant comes the ranks of lieutenant, captain, major, and warden. (*Id*. at 182). Above the warden are the regional director, deputy director of prisons and jails, director of the Correctional Institution Division, and executive director. (*Id*.).

30, 2016, Lieutenant Garcia wrote Beck another EPL for being late to a "turnout" meeting. (ECF 46-1 at 14). Beck filed a grievance regarding the December 30, 2016 EPL, and the EPL was removed. (*Id*. at 6–8). On January 2, 2017, Beck filed an internal equal employment opportunity complaint ("EEO complaint") against Lieutenant Garcia detailing the incidents from August to December 2016. (ECF 54 at 270–78). EEO complaints are the internal process TDCJ employees use to file a claim for violations of TDCJ's Employee General Rules of Conduct. (*See* ECF 46 at 262). Lieutenant Garcia acknowledged receipt of the EEO complaint on January 23, 2017. (ECF 57-5 at 2).

Lieutenant Garcia wrote Beck an EPL for being late to work on February 2, 2017. (ECF 46-1 at 76). On February 3, 2017, Beck filed an employee grievance form regarding an incident the day before involving Lieutenant Garcia. (*Id*. at 28–31). The form states that on February 2, 2017 Lieutenant Garcia told Beck to put power steering fluid in "whatever hole is available" and did not immediately allow Beck to go home after she got sick and soiled her clothes. (*Id*. at 29–30). On February 10, 2017, Beck called Captain Troy Crutchfield ("Captain Crutchfield") to discuss the issues she was having with Lieutenant Garcia. (ECF 54 at 427). Lieutenant Garcia asked Beck for the phone to confirm with whom she was speaking, and Beck refused. (*Id*.). Beck told Captain Crutchfield she felt Lieutenant Garcia was harassing her. (*Id*.). Lieutenant Garcia charged Beck with certain rule violations as a result of the incident. (ECF 57-1 at 55). Beck was found not guilty of the rule violations. (ECF 54 at 167–68). On February 17, 2017, Beck filed an employee grievance regarding the February 2, 2017 EPL Lieutenant Garcia wrote her, as well as Lieutenant Garcia's treatment of her on February 2, 2017. (ECF 46-1 at 40–44). The February 2, 2017 EPL was removed in May 2017. (*Id*. at 34–36). On February 23, 2017, Lieutenant Ryan Brundage ("Lieutenant Brundage") wrote Beck an EPL for being late to a "turnout" meeting. (*Id*. at 112). Beck filed a grievance regarding the February 23, 2017 EPL, and the EPL was upheld. (*Id*. at 98–99). On March 1, 2017, Lieutenant Brundage charged Beck

3

with a rule violation for being late to a "turnout" meeting and having three occurrences of tardiness—February 2, 2017, February 23, 2017, and March 1, 2017—to such meetings. (*Id*. at 152–53, 157–58). Beck was found guilty of the rule violation and reprimanded on March 17, 2017. (*Id*. at 150).

On March 31, 2017, Lieutenant Garcia charged Beck with a rule violation for being late to a "turnout" meeting and recommended "formal" discipline due to "prior incidents of similar nature." (ECF 46 at 302–05). The same day, a pre-hearing investigation regarding Lieutenant Garcia's recommendation of formal discipline due to tardiness was conducted, and Beck was charged with insubordination due to her alleged conduct during the pre-hearing investigation towards Major Shalaine Gillette ("Major Gillette"). (ECF 46-2 at 1, 3–4). Warden Kevin Foley ("Warden Foley") gave Beck three months of probation for insubordination. (*Id*. at 1). This disciplinary action was overturned in 2018. (*Id*. at 9). Warden Kirt Stiefer ("Warden Stiefer") conducted a disciplinary hearing regarding Beck's March 31, 2017 tardiness. (ECF 54 at 535–36). Based on Beck's claims during the hearing, Warden Stiefer charged Beck with a rule violation for giving a false statement during a disciplinary hearing. (*Id*. at 535–37). Beck was found guilty of the rule violation and given ten months of probation on June 20, 2017, but the disciplinary action was overturned in 2018. (ECF 46 at 290).

On May 8, 2017, Beck filed an EEO complaint against Warden Stiefer for: (1) sexually discriminating against her during a grievance meeting regarding her tardiness where Warden Stiefer allegedly said he did not care about her medical issues; (2) retaliating against her for her previous EEO complaints by charging her with a rule violation for giving a false statement during a disciplinary hearing; and (3) creating a hostile work environment for her. (ECF 54 at 531–33). Sometime after a June 2, 2017 grievance meeting, Eric Guerrero, the Regional Director at the time, found that Beck should only have received an EPL for being late to the March 1, 2017 "turnout" meeting, not a charge

for a rule violation for third occurrence of tardiness, because the February 2, 2017 EPL for tardiness had previously been removed. (ECF 46-1 at 172). Thus, the March 17, 2017 reprimand was overturned. (*Id*. at 143).

On June 5, 2017, Beck filed an EEO complaint against Warden Stiefer for gender discrimination, EEO retaliation, and tampering with her witness regarding the insubordination charge, for which Warden Foley gave her three months of probation. (ECF 54 at 865–70). On June 13, 2017, Beck filed an employee grievance form regarding a May 24, 2017 grievance meeting. (*Id*. at 48–49). Beck stated in the grievance form she felt belittled and intimidated by Warden Stiefer. (*Id*. at 49). On July 6, 2017, Beck filed an employee grievance form claiming Lieutenant Garcia left her in a vehicle for four hours during 104–108-degree temperatures on June 17, 2017. (*Id*. at 66, 71–72).

On August 2, 2017, Beck again filed an EEO complaint against Lieutenant Garcia for the alleged events of February 2, 2017—his comment regarding the power steering fluid and the EPL he wrote her that day for being late to work. (*Id*. at 586–89). Lieutenant Garcia responded to the EEO complaint on November 1, 2017. (*Id*. at 597–98). The same day, November 1, 2017, Lieutenant Garcia charged Beck with rule violations for insubordination and leaving a loaded state-issued weapon in an unsecured vehicle. (*Id*. at 787, 806). A charge of leaving a loaded state-issued weapon in an unsecured vehicle is a level two charge. (*Id*. at 135). The range of punishment for a level two charge includes dismissal. (*Id*. at 140). During the pre-hearing investigation, Beck stated she accidentally left the door of the vehicle unlocked during weapons exchange. (*Id*. at 141). Warden Foley held a disciplinary hearing on the charges on November 20, 2017 and recommended Beck be dismissed and her employment be terminated. (*Id*. at 134–35). November 20, 2017 was Beck's last day of employment, though she was paid through December 3, 2017. (ECF 57-2 at 12).

Beck brought this suit on November 20, 2018. (ECF 3). She brings the following claims: (1) sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) sexual harassment under Title VII; and (3) retaliation under Title VII. (*See* ECF 3). TDCJ's motion for summary judgment seeks dismissal of all Beck's claims.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. at 248. To determine whether there are any genuine issues of material fact, the Court must first ascertain the factual issues that are material under the applicable substantive law. *See id*.; *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076, n.14 (5th Cir. 1994). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Lavespere*, 910 F.2d at 178; *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990) (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986) (internal quotation omitted)); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). However, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16, n.7 (5th Cir. 1992). The Court should not weigh the

evidence and determine the truth of the matter in determining whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, no genuine dispute for trial exists. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence and are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

If "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot*, 780 F.2d at 1194. The "beyond peradventure" standard imposes a "heavy" burden. C*ont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-cv-1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007). If "the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation omitted)). The movant then "must demonstrate the absence of a genuine issue of material fact," but does not have "to negate the elements of the nonmovant's case." *Id*. (citing *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

"If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick Cty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little*, 37 F.3d at 1075). On

the other hand, if the movant meets its burden to show an absence of evidence supporting the nonmovant's case, then the nonmovant must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial. *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 324). If the nonmovant cannot provide some evidence to support its claim, summary judgment is appropriate. Fed. R. Civ. P. 56(e); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).

## III.   ANALYSIS

### A. Beck's sexual harassment claims

#### i.   Quid pro quo

"To succeed on a Title VII quid pro quo claim against an employer, a plaintiff must show (1) that she suffered a tangible employment action; and (2) that the tangible employment action resulted from the acceptance or rejection of a supervisor's sexual advances." *Higgins v. Lufkin Indus., Inc.*, 633 F. App'x 229, 232 (5th Cir. 2015). A "tangible employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 570 U.S. 421, 429 (2013) (citations and internal quotation marks omitted). An individual is a "supervisor" for the purposes of a quid pro quo claim if he or she has the authority to take a tangible employment action against the plaintiff. *Id.* at 431.

#### ii.   Hostile work environment

A sexually hostile work environment claim requires a plaintiff to show the following: "(1) she is [a] member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of [her] employment; and (5) her employer knew or should have known of the harassment and

failed to take prompt remedial action." *Hoskins v. GE Aviation*, 803 F. App'x 740, 744 (5th Cir. 2020) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)). When an employee brings a "Title VII sexual harassment case alleging that a supervisor with immediate (or successively higher) authority over the employee harassed the employee[,]" the employee "need only satisfy the first four elements." *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

Regarding the third element, the plaintiff must demonstrate a "connection between the allegedly harassing incidents and [her] protected status." *Davis v. RealPage, Inc.*, No. 3:18-CV-0986-D, 2020 WL 1325201, at \*16 (N.D. Tex. Mar. 20, 2020) (citation and internal quotation marks omitted). Regarding the fourth element, the Fifth Circuit Court of Appeals has stated:

> Harassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolation. In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration. This includes the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations and internal quotation marks omitted). The Supreme Court has stated:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). Merely offensive conduct is not actionable. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "But Title VII comes

into play before the harassing conduct leads to a nervous breakdown." *Id.* at 22. Title VII does not require the alleged discriminatory conduct to cause "concrete psychological harm," "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive,…there is no need for it also to be psychologically injurious." *Id.* (citation omitted).

### iii.    Employer's vicarious liability and availability of affirmative defense

"An employer can be held vicariously liable for workplace harassment by its employees. The employer's liability, however, may depend on the status of the harasser." *Jones v. Dallas County*, 47 F. Supp. 3d 469, 492 (N.D. Tex. 2014) (citation and internal quotation marks omitted).

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance*, 570 U.S. at 424 (citations omitted).

### iv.    Discussion

#### a.    Because Beck failed to meet her summary judgment burden to show Lieutenant Garcia was a supervisor for purposes of vicarious liability under Title VII, her claim is properly analyzed as a hostile work environment claim.

TDCJ argues Beck has the burden of proof to show Lieutenant Garcia was her supervisor for purposes of vicarious liability under Title VII and she has identified no tangible employment actions Lieutenant Garcia was allowed to take against her. (ECF 49 at 35–36). TDCJ cites to the

10

job descriptions of Sergeant of Correctional Officers and Lieutenant of Correctional Officers to show Lieutenant Garcia was, at most, given leadership responsibilities. (*Id*. at 36). Beck claims TDCJ failed to meet its initial summary judgment burden because it cites only internal documents. (ECF 58 at 38). In support of her argument that Lieutenant Garcia was her supervisor, Beck also cites various internal documents referring to Lieutenant Garcia as a "supervisor." (*Id*.).

The undersigned finds Beck failed to create a genuine issue of material fact on whether Lieutenant Garcia was her "supervisor" for purposes of vicarious liability under Title VII. The burden of proof at trial to show the allegedly harassing employee was a supervisor lies with plaintiff. *Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 214 (5th Cir. 2016). Thus, TDCJ has the initial burden to show the absence of a genuine issue of material fact as to whether Lieutenant Garcia was Beck's supervisor. *Duffie*, 600 F.3d at 371. If TDCJ meets this burden, the burden shifts to Beck to show specific evidence creating a genuine issue of material fact. *Little*, 37 F.3d at 1075.

TDCJ met its initial burden by providing Lieutenant Garcia's job descriptions that show he was not authorized to take tangible employment actions against his subordinates. In response, Beck offered evidence TDCJ and Lieutenant Garcia referred to Lieutenant Garcia as Beck's "supervisor" in internal documents. Beck cites EPLs Lieutenant Garcia completed for various TDCJ employees and initialed as the "supervisor" (ECF 54 at 623–45, 652–55), EPLs Lieutenant Garcia completed for Beck and initialed as the "supervisor" (ECF 57-1 at 52, 54, 57–59), and a leave request from Beck that Lieutenant Garcia signed as her "supervisor" (*id*. at 53). Beck also offers the hearing testimony of Terry Bailey, Human Resources specialist, who states Lieutenant Garcia was Beck's "formal supervisor" (ECF 57-2 at 2, 13), and Lieutenant Garcia's hearing testimony stating he was Beck's supervisor (ECF 57-3 at 33).

11

Beck's arguments and evidence focus on the use of the title "supervisor" and references to Lieutenant Garcia as "supervisor," but her arguments and evidence do not address whether Lieutenant Garcia actually had the authority to take tangible employment actions against her. Authorization to direct Beck's daily work activities is not sufficient to show Lieutenant Garcia was her supervisor. *See Spencer v. Schmidt Elec. Co.*, 576 F. App'x 442, 447–48 (5th Cir. 2014) (foreman who gave employees direction on how to do jobs were not "supervisors" because they had no authority to take tangible employment actions); *Morrow v. Kroger Ltd. P'ship I*, 681 F. App'x 377, 380–81 (5th Cir. 2017) (employee with leadership responsibilities including filling out performance evaluations and scheduling was not "supervisor," even though employee "had some influence" over store manager with authority to take tangible employment actions). Beck failed to show specific evidence creating a genuine issue of material fact on whether Lieutenant Garcia was her supervisor for purposes of vicarious liability under Title VII. Thus, her co-worker sexual harassment claim is properly analyzed as a hostile work environment claim. *See Hague v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 560 F. App'x 328, 331–32 (5th Cir. 2014) (sexual harassment claim properly analyzed under hostile work environment standard because plaintiff failed to show alleged harasser was her supervisor rather than her co-worker).

> **b.     Beck failed to meet her summary judgment burden to show the alleged unwelcome sexual harassment was sufficiently severe or pervasive.**

TDCJ argues none of the incidents or conduct Beck identifies as "sexual harassment" involving Lieutenant Garcia are "extreme" enough to constitute sexual harassment or render her workplace "hostile" or "abusive," and Beck does not argue Lieutenant Garcia's alleged conduct threatened or humiliated her. (ECF 49 at 37–38). In response, Beck cites the following alleged instances of harassment she claims created a hostile work environment and evidence in support:

1. Lieutenant Garcia referred to a work-related outing as a date. (ECF 46 at 17–18);

2. Lieutenant Garcia wrote her up for being late despite her timely notifying him she would be late.;

3. Lieutenant Garcia wrote her up for using a telephone to make an EEO complaint against him. (ECF 54 at 176);

4. Lieutenant Garcia offered to remove an EPL if she agreed to have a personal relationship with him. (ECF 46 at 22, 283);

5. Lieutenant Garcia followed her, stared at her, and hovered over her while she worked.;

6. Lieutenant Garcia made a lewd comment to her about putting oil in "whatever [hole] was available" after she made a comment about her husband. (ECF 46-1 at 28–31);

7. Lieutenant Garcia wrote EPLs against her for attendance issues associated with her soiling herself or attempting to avoid soiling herself due to her female medical conditions, including the ones that resulted in her termination.;

8. Lieutenant Garcia left her in an outdoor shift position for four hours in 108-degree weather. (ECF 54 at 65–72); and

9. Lieutenant Garcia repeatedly asked about her personal relationship with her husband. (ECF 46 at 17–18).

(ECF 58 at 47–48).

The Fifth Circuit Court of Appeals has defined "unwelcome sexual harassment" as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee." *Marquez v. Voicestream Wireless Corp.*, 115 F. App'x 699, 701 (5th Cir. 2004) (quoting *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)).[3] The

---

[3] Beck cites *Humphreys v. Medical Towers, Ltd.* for the proposition that sexual harassment does not have to be explicitly sexual in nature if the harassment impaired plaintiff's ability to do her job and altered her work conditions. (ECF 58 at 48) (citing *Humphreys v. Med. Towers, Ltd.*, 893 F. Supp. 672, 683 (S.D. Tex. 1995)). *Humphreys* is not binding on this Court, nor is it terribly persuasive. In stating that harassing conduct need not be explicitly sexual in nature

undersigned finds the second, third, and eighth instances set out above do not fall within the Fifth Circuit's definition of "unwelcome sexual harassment." *See Montgomery-Smith v. George*, 810 F. App'x 252, 259–60 (5th Cir. 2020) (denials of promotion, rude behavior, and claims of isolation and ostracism are insufficient to support a hostile work environment claim). The undersigned further concludes the remaining alleged conduct, while not ideal, is not sufficiently severe or extreme under applicable law to avoid summary judgment.

This District has found a single incident of deliberate touching of a plaintiff's intimate body parts sufficient to preclude summary judgment on a plaintiff's hostile work environment claim. *Hale v. Tex. Dep't of Criminal Justice*, No. 7:18-CV-097-M-BQ, 2019 WL 7500593, at *6 (N.D. Tex. Dec. 3, 2019), *adopted by* No. 7:18-CV-097-M, 2020 WL 95653 (N.D. Tex. Jan. 8, 2020) ("Taking the facts in the light most favorable to Hale, Eastep walked up behind Hale, placed his arms on each side of her to trap her against the fence, pushed his clothed penis against her buttocks, and whispered 'What is that?' into her ear before she forced her way under his arm and confronted him."). In contrast, this District has found other inappropriate conduct, such as sexual gestures, frequently going out of one's way to be around plaintiff and watching plaintiff from a close distance, using terms of endearment and flirting, touching plaintiff on the shoulder or middle back, and asking to touch plaintiff's boobs, insufficient to avoid summary judgment on a plaintiff's hostile work environment claims. *See Pando v. Lowe's Mkt.*, No. 5:15-CV-218-C, 2017 WL 5640618, at *3 (N.D. Tex. Apr. 21, 2017); *see also Williams v. Innovate Loan Servicing Corp.*, No. 4:13-CV-994-A, 2015 WL 1402336, at *2–3 (N.D. Tex. Mar. 26, 2015).

---

to support a hostile work environment claim, *Humphreys* relies on non-Fifth Circuit court of appeals and district court opinions.

Beck failed to show specific evidence creating a genuine issue of material fact on whether the alleged unwelcome sexual harassment was sufficiently severe or pervasive. The Court should grant TDCJ's motion for summary judgment on Beck's hostile work environment claim.

## B. Beck's sex discrimination claim

A plaintiff who seeks to establish a prima facie case by comparison to another employee:

> must demonstrate that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Sacchetti v. Optiv Sec., Inc.*, 819 F. App'x 251, 253 (5th Cir. 2020) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). If the plaintiff establishes a prima facie case, "the burden of production shifts to the employer 'to articulate some legitimate, nondiscriminatory reason'" for firing the plaintiff. *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant satisfies this burden, the plaintiff "must offer some evidence that the reason proffered was a pretext for discrimination, or that a 'motivating factor' for the employment decision was the plaintiff's protected characteristic." *Id*.

> To be "similarly situated," comparators must be "nearly identical." *Lee*, 574 F.3d at 260. They must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id*. (footnotes omitted). "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id*. We have consistently "defined 'similarly situated' narrowly, requiring the employees' situations to be 'nearly identical.' " *West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020) (quoting *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005)).

*Sacchetti*, 819 F. App'x at 254.

**i.    The existence of an adverse employment action is undisputed.**

TDCJ argues the only adverse employment action Beck alleges is her termination. (*See* ECF 49 at 46–49). In response, Beck notes TDCJ does not dispute she was terminated, which constitutes an adverse employment action under applicable law. (ECF 58 at 50). Given that the parties seem to agree Beck alleged an adverse employment action—her termination—the undersigned turns to TDCJ's second argument regarding Beck's Title VII sex discrimination claim.

**ii.    Beck failed to meet her summary judgment burden to show a comparator.**

TDCJ argues Beck cannot meet her burden to identify a comparator outside her protected class, who had the same job, title, and duties, was under the same supervisor, committed the same infractions, and yet was not discharged. (*See* ECF 49 at 51–53). In response, Beck argues applicable law only requires she show the misconduct a comparator engaged in was nearly identical to the misconduct for which she was fired. (ECF 58 at 50–51). Beck alleges she was terminated due to prior EPLs and false allegations that she left a weapon unsecured in a vehicle. (*See id*. at 34). Thus, Beck must show a genuine issue of material fact exists as to whether she was treated less favorably because of her female sex than were other similarly situated male employees, under circumstances involving nearly identical misconduct. *See Lee*, 574 F.3d at 259. The undersigned finds Beck failed to make such a showing.

Beck claims some male employees did not receive EPLs under circumstances nearly identical to those under which she received EPLs, and male employees have left weapons unsecured in vehicles and not been terminated, yet she was terminated for the same conduct. (*See* ECF 58 at 51–52). However, Beck cites only her own EEO complaint and written statements to

16

support her claim that some male employees did not receive EPLs under circumstances nearly identical to those under which she received EPLs. (*Id.*) (citing ECF 54 at 244–45, 254).

Additionally, Beck's position is that *the combination* of prior EPLs and the weapon incident led to her termination, and she does not offer evidence of a male employee who was not terminated under nearly identical circumstances. *See Lee*, 574 F.3d at 260 ("The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, *and have essentially comparable violation histories*.") (emphasis added). She cites the testimony of Marty Turner ("Turner"), a union representative, at the March 5, 2018 hearing regarding her appeal of her termination to show male employees were not terminated after leaving a weapon unsecured in a vehicle. (ECF 58 at 52; *see* 57-2 at 3–4; 57-4 at 11, 37, 39–41). Turner testified he was aware of "other employees" that were disciplined for having unsecured weapons in their vehicles and not terminated. (ECF 57-4 at 40). Turner did not testify *male* employees were not terminated after leaving a weapon unsecured in a vehicle. Beck also cites her testimony at the same hearing that a male employee was not terminated after failing to secure a handgun in a vehicle. (*Id.* at 33). However, Beck testified the male employee did not have "any priors" as far as she was aware. (*Id.* at 34).

Beck failed to show specific evidence creating a genuine issue of material fact regarding the fourth factor of her Title VII sex discrimination claim. Thus, the Court should grant TDCJ's motion for summary judgment on the claim.

**C. Retaliation**

The following framework applies to Plaintiff's Title VII retaliation claim:

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden to show: "(1) that [she] engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (internal quotations and citations omitted). We have interpreted Title VII's opposition clause to mean that a plaintiff engages in protected activity when she complains of an employment practice that she "reasonably believes" violated Title VII. *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 240 (5th Cir. 2016). If an adverse employment action occurs within close temporal proximity to protected activity known to the employer, a plaintiff will have met her burden to establish a prima facie case of retaliation. *See Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019).

Once the plaintiff meets her initial burden, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the employer proffers a legitimate, nondiscriminatory reason, the burden then returns to the plaintiff to prove that the employer's reason is pretext for unlawful discrimination. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 607 (5th Cir. 2005). At the pretext stage, the plaintiff must offer evidence "that the adverse action would not have occurred but for [her] employer's retaliatory motive." *See Feist v. La., Dep't of Justice Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). "[T]he combination of suspicious timing with other significant evidence of pretext ... can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999).

*Badgerow v. REJ Properties Inc.*, 974 F.3d 610, 619 (5th Cir. 2020).

### i.    It is undisputed Beck engaged in activity protected by Title VII.

With respect to the first factor, whether Beck engaged in activity protected by Title VII, TDCJ states "Beck must show that her termination was causally linked to her complaints of sexual harassment or sex discrimination or her prior lawsuit." (ECF 49 at 56). Beyond this statement, TDCJ does not seem to challenge whether Beck engaged in activity protected by Title VII. Beck did not expressly list the protected activity in which she believes she engaged. However, she mentions her prior internal EEO complaints and her previous lawsuit against TDCJ in the relevant section of her briefing. (*See* ECF 58 at 56–57). Filing suit under Title VII is a protected activity. *See Casarez v. Burlington N./Santa Fe Co.*, 193 F.3d 334, 339 (5th Cir. 1999).

18

Additionally, "[a]n employee that files an internal complaint of discrimination engages in a protected activity." *Rodriquez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 328 (5th Cir. 2013).

### ii.    It is undisputed an adverse employment action exists.

TDCJ argues the EPLs, charges of rule violations, and other allegedly improper treatment Beck received are not adverse employment actions because disciplinary actions in the form of reprimands do not constitute adverse employment actions. (ECF 49 at 55–56). The motion claims Beck alleges only one adverse employment action—her termination. (*Id.*). In response, Beck argues the EPLs contributed to her termination, and it is undisputed that she was terminated. (*See* ECF 58 at 56). It is undisputed Beck's termination constitutes an adverse employment action. Because it is not clear whether Beck claims the EPLs by themselves constitute adverse employment actions, and because Beck did not brief or provide support for any such claim, the undersigned will not address whether the EPLs by themselves constitute adverse employment actions.

### iii.    Beck met her summary judgment burden to show a causal link exists between the protected activity and the adverse action.

As previously stated, TDCJ argues "Beck must show that her termination was causally linked to her complaints of sexual harassment or sex discrimination or her prior lawsuit." (ECF 49 at 56). TDCJ states the Court's focus must be on the final decisionmakers, which it argues are "Warden Foley, Regional Director Blackwell, Deputy Director Hirsch and Director Lorie Davis." (*Id.*). According to TDCJ, these decisionmakers had no motive to retaliate against Beck. (*Id.*). The motion states Warden Foley recommended Beck be terminated based on the weapon incident, did not know about Beck's prior EEO complaints until the disciplinary hearing, and did not know about her previous lawsuit against TDCJ. (*Id.* at 56–57). TDCJ argues Beck has no

evidence any other decisionmaker that approved her termination did so "for any reason other than the serious rule violation she had committed." (*Id*. at 57).

In response, Beck argues Warden Foley knew about her prior EEO complaints before making his decision (ECF 58 at 56), and Director Heaton testified he was present at the settlement of her previous lawsuit against TDCJ and told his supervisors about the settlement. (*Id*. at 57). Beck also seems to argue the cat's paw theory of liability applies to the facts of this case, such that even if the decisionmakers regarding her termination did not harbor any retaliatory animus, TDCJ is liable because Lieutenant Garcia had a retaliatory motive and influenced the decisionmakers to terminate her. (*See id*. at 56). Beck claims "the investigators into the matter relied heavily on Lt. Garcia's description of the incident." (*Id*.). Beck further claims Lieutenant Garcia wrote her two EPLs the same day he received notice of and submitted a response to her second EEO complaint against him. (*Id*.). Plaintiff's response also states Major Gillette wrote to Warden Stiefer and described how Beck "had characterized Lt. Garcia's behavior and accusing her of being retaliatory." (*Id*.). Finally, Beck claims within a month of settling her previous lawsuit against TDCJ, the "series of unwarranted EPLs and questioning by Major Gillette into Beck's medical condition" began. (*Id*. at 57).

"To establish a causal connection, a plaintiff must first show that the decision maker was aware of the protected activity." *Garcia v. City of Amarillo*, No. 2:18-CV-95-Z-BR, 2020 WL 4208060, at *13 (N.D. Tex. July 22, 2020) (quoting *McLaurin v. City of Jackson Fire Dep't*, 217 F. App'x 287, 288 (5th Cir. 2006)). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). "[A] time lapse of up to four months has been found sufficient to satisfy the causal connection

for summary judgment purposes." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (internal quotation omitted).

With respect to Director Heaton, Beck has offered no evidence he was a decisionmaker as to her termination. However, her response cites Warden Foley's deposition testimony where he admits she told him about her EEO complaints against Lieutenant Garcia at a disciplinary hearing (ECF 58 at 34) (citing ECF 46 at 190–91), and TDCJ agrees Warden Foley was a decisionmaker (*See* ECF 49 at 56). Beck filed her second EEO complaint against Lieutenant Garcia on August 2, 2017. (ECF 58 at 31) (citing ECF 54 at 586–89). Warden Foley recommended Beck be terminated on November 20, 2017, which was her last day of employment. (ECF 57-2 at 10, 12; 54 at 134). Thus, the time between the last instance of protected activity and Warden Foley's recommendation of dismissal and Beck's last day of employment was less than four months. The undersigned finds Beck has satisfied the elements for a prima facie case of retaliation based on these facts.[4]

The undersigned further finds the cat's paw theory of liability inapplicable based on the briefing and evidence Beck offers. "[A] Title VII retaliation plaintiff is entitled to use the cat's paw theory of liability if he can demonstrate that a person with a retaliatory motive 'used the decisionmaker to bring about the intended retaliatory action.'" *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)). "[Such] a plaintiff must produce sufficient evidence that '(1) his ... supervisors,

_____

[4] Beck does not address why the remaining, less temporally proximate, protected activity she mentions in her response—her 2012 Charge of Discrimination filed with the EEOC, her 2015 lawsuit against TDCJ, her January 2, 2017 EEO complaint, and her May 8, 2017 EEO complaint—are sufficiently close in time to her termination to show the requisite causal link at the prima facie stage. Based on the absence of argument and briefing on the subject, the undersigned declines to analyze whether the more attenuated protected activity is sufficiently close in time to Beck's termination to make the requisite prima facie showing. Regardless, for the reasons explained below, Beck's claim inevitably fails at the pretext stage.

motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a but-for cause of his [termination].'" *Id*. (quoting *Zamora*, 798 F.3d at 333). Beck offers very little argument or evidence showing that a person with a retaliatory motive used a decisionmaker to bring about her termination. She claims "the investigators into the matter relied heavily on Lt. Garcia's description of the incident" (ECF 58 at 56), but the statement is vague and she cites no evidence to support it. She claims "Major Gillette also wrote to Warden Stiefer, describing how Beck had characterized Lt. Garcia's behavior and accusing her of being retaliatory." (*Id*.). However, Beck has not shown Warden Stiefer was a decisionmaker as to her termination, nor has she shown Major Gillette's statement that she was retaliatory had anything to do with her termination.

### iv. TDCJ met its summary judgment burden to show a legitimate, nonretaliatory reason for Beck's termination.

Because Beck has made a prima facie showing of retaliation, the burden shifts to TDCJ to show a legitimate, nonretaliatory reason for her termination. TDCJ's burden is one of production, not proof, and involves no credibility assessments. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). TDCJ cited evidence that Beck was charged with leaving a loaded weapon in an unattended vehicle in violation of TDCJ's Mobile Patrol Post Orders, Beck admitted doing so, and the charge, a level two offense, carries a range of punishment including dismissal. (*See* ECF 49 at 57–58) (citing ECF 54 at 140–42).

### v. Beck failed to meet her summary judgment burden to show TDCJ's proffered reason for her termination is a pretext for discrimination.

Because TDCJ met its burden of producing evidence of a nondiscriminatory reason for Beck's termination, the burden shifts back to Beck to prove TDCJ's proffered reason is not true but instead is a pretext for discrimination. *See McCoy*, 492 F.3d at 557. "Temporal proximity

gets [plaintiff] through [her] prima facie case but does not, on its own, establish that the company's stated explanation for [plaintiff's] firing was mere pretext…At the pretext stage, the Supreme Court's decision in *Nassar* requires a showing of but-for causation, which requires more than mere temporal proximity." *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243–44 (5th Cir. 2019) (discussing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). After the employer states its reason, the burden shifts back to the employee to demonstrate the employer's reason is a pretext for retaliation, "which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013).

Beck argues TDCJ has treated the offense as one for which termination is not immediately warranted when dealing with other employees. (ECF 58 at 57). Though she cites no evidence to support her conclusory statement, the Court notes Turner's March 5, 2018 hearing testimony that he was aware of other employees that were disciplined for having unsecured weapons in their vehicles and not terminated. (ECF 57-4 at 40). However, Turner also testified TDCJ's position was that terminating Beck for the offense was appropriate under its progressive disciplinary policy. (*Id*.). Thus, Turner's testimony explains why one employee may not be fired for the offense, while another employee may be, and there is no indication the other employees Turner referenced had the same disciplinary history as Beck. Because Beck failed to show specific evidence creating a genuine issue of material fact as to whether TDCJ would have terminated her but for a retaliatory motive, the Court should grant TDCJ's motion for summary judgment on Beck's retaliation claim.

## IV.     **RECOMMENDATION**

It is the RECOMMENDATION of the United States Magistrate Judge to the United States

District Judge that Defendant's Motion for Summary Judgment (ECF 45) be GRANTED.

## V.    INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Findings, Conclusions, and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED November 23, 2020.

LEE ANN RENO
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions, and recommendation. In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line. Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E). Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed as indicated by the "entered" date. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Findings, Conclusions, and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge and accepted by the district court. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), as recognized in *ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, n.5 (5th Cir. 2012); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).